First case this morning is in re the marriage of Beiler. Did I pronounce that correctly? Beiler. Thank you. For the appellant, Ms. Sackice and Mr. Mendenhall. For the appellee, Mr. Erickson, you may proceed. May it please the court and counsel, my name is Kristen Sackice and I'm from the law firm of Bowlin, Robinson & Willis. I am here today on behalf of the plaintiff's appellant, Leanna Beck. The question here today is whether the trial court failed to adequately consider the statutory factors found in 750 IL 5602 and improperly granted the defendant custody of the minor children. Under the statute there are eight factors for the court to consider. I'm not going to belabor each factor as the bottom line is determination of what was in the children's best interest. I am not here today to defend a mother who allegedly left her children unattended in a vehicle or for a few times a year socialized after her children were sleeping. Rather I'm here to present the facts within the record that seem to either be forgotten or simply not considered. Our firm did not try this case and as a result we have spent endless hours pouring over the record again and again trying to make some sense of what happened. How can an appellate court say that a trial judge was wrong in weighing the evidence when the trial judge heard the evidence? He knows more about it than we ever will. I understand that the discretion that the trial court has is broad but I don't think it's unlimited. And I think in this case if all of the evidence was viewed equally there would have been a different determination. Here the evidence presented at trial demonstrated that the children's best interest would be served by custody being awarded to the plaintiff. However the trial court did find differently. It's our belief that the trial court's decision to award the defendant custody was against the manifest weight of the evidence. Obviously a judgment is against the manifest weight of the evidence if a different or opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary or not based upon the evidence. I understand and acknowledge that the trial court is provided with the broad discretion to make those decisions. However I do acknowledge that the discretion is unlimited. I understand I'm waging an uphill battle here and it's a difficult argument to make. In this specific case the trial was held on six different days spanning over four months. The plaintiff was on the stand for over three different days and the majority of the judge's opinion however was focused on that last day. I do not necessarily believe that the trial court was biased or prejudiced against the plaintiff. Just for some reason he seemed to be over influenced by the last day or simply forgot the positive attributes that were testified to with regards to the plaintiff. You know this isn't like an automobile accident case where you say you get damages or you do not get damages. In a custody case the child has to go to one parent or the other and sometimes you have two good parents. And how does the trial court decide? He gives it his best shot and how can anybody say that he's wrong? I think in that case where you have two equal parents and I don't think anyone is here today to argue that Mr. Byler or Mrs. Beck isn't a good parent. I think they both have been good parents. But in that situation I think it's clear that you would go with the primary custodial parent and continue some level of stability and continuity in these children's lives. These children at the time of trial were six months old. Well that's exactly what the trial court said they didn't have. Stability. Because in viewing the evidence because of the incidents, particularly the incidents but then also the heavy involvement of grandparents which is good in many ways but he also found that disruptive and back and forth. I don't know that I would necessarily agree with that but I wasn't in the courtroom. So rather than focusing on the standards, which we know, what evidence is it that weighs so heavily in favor of your client that the trial court should have ruled in your favor or that the trial court overlooked? The first thing is that the stability and continuity in these children's lives. The father, the defendant in this case, worked at times 10 to 12 hours a day. During that time the one person that was with these children consistently was mom. From the minute they woke up, from the minute they go to bed. Dad had time where he would come home for dinner or would go to the gym and come home and the children would be put to bed. There was no credit given to the mother for the stability that she provided in those children's lives. The six-year-old had just started school and the testimony from the teacher was very favorable to both clients but particularly to the plaintiff was that this child came to school prepared every day, appropriately dressed, and was one of the best students in the class.  She was tardy a lot. She still excelled, though, at the level that she was in. And that was mom. Mom did get her late to school. But mom also was a parent that got her to school, got her prepared, and prepared her, readied her enough to a level that she was doing well in school. There was testimony in the record that the children had medical conditions. The mother was the one tending to their medical conditions. She was the one bringing them to the doctor. There was negative testimony against the plaintiff that one child had a bad diaper rash. Instead of the defendant taking her to the doctor, he waits until the plaintiff comes and picks up the child and says, go take her to the doctor. It was severe enough that they had taken pictures of it, but he made no affirmative action to take her to the doctor but said to mom, go ahead and go take her to the doctor. There were numerous instances of where mom had been the primary person in the children's lives. Yes, they were married. Yes, dad came home every day. Yes, dad was there in the morning. But when it came down to who was with those children all of their waking hours, it was mom. There also was absolutely no testimony that some of the decisions that the plaintiff made or some of the things that she did by going out in the evenings after the children went to bed interfered with the children's lives in any way or rocked that vote of stability. The children went from being with mom eight and ten hours of their day to now seeing mom every other weekend. And I don't see how that can be a continuance of the level of continuity and stability that the court has emphasized. Did they spend a lot of nights with her parents? I think there was about two days a week when she was at work during the period of separation where while she would drop them off prior to going to school. So maybe neither parent was a primary custodian. Eight to ten hours of every day though she was when he didn't have the children. He physically could not be the primary custodial parent because he was the one working. And I don't fault him for being the one that had to prepare and provide for the family, but as a result of the fact that he was the one that worked, she was home with the kids. And at no time did he try to change that with some great concerns for their welfare or for the safety. And I assume when they made the decision for her to stay home with the kids as they were married, that was a joint decision. Was there testimony about the pattern of his care or lack of care during the periods of the year that he was unemployed? Or laid off rather. That he was laid off, that he was unemployed, that he volunteered for school. I think his care was... So if he's laid off during the winter, he would be home during the day. And when the children left for school and when they came home from school. I believe that was during the time of separation, so they were living separate and apart and the children lived with her. He was only laid off one winter during the period of the marriage? I thought that was his work. I mean, roofers don't typically roof in December. I don't think there was anything within the record that showed a pattern of him being laid off and taking care of the children. I think during the time, if I recall correctly, where there was some testimony of him trying to be more involved in the children's lives was during the period of separation. I think there are certain facts that are important in this case. The plaintiff and defendant were married for six years. As I spoke previously, there were two children, six and almost four. The plaintiff stayed home as a stay-at-home mom. She would, between two and four hours a week, teach an exercise class. One of the things that I do believe was overlooked is there was testimony from multiple people that even on those nights when she would teach this exercise class, that instead of defendants staying home with the children, she dropped the children off at her parents' house. There is a large amount of critique on the plaintiff's parents, the maternal grandparents in this case. What I find strange that was not addressed by the court is that at no time did the defendant ask the plaintiff, hey, I don't want the children around your parents. I'm concerned about your parents. Instead, during their marriage, there was testimony that they used both sets of grandparents on the weekends for babysitting so that together they could go out. During the period of separation, she continued to use her parents for assistance for daycare, as he did. It was a great arrangement they both had. No one had to pay a babysitter. They had someone helping with the kids. He, at trial, had all these great concerns about the grandparents. The trial court concurred with him. And at the same time, there was nothing throughout the separation period, throughout the marriage, where he voiced any concerns about the grandparents. At no time during the marriage or during the separation was the defendant ever charged with the duty of being the primary custodial parent. That happened when the court entered its order. And that was the first time he ever had been responsible for everything dealing with the children. The trial court makes a statement in his order that the defendant had been the one to primarily administer medication. That's not in the record. The record says when the children had breathing treatments, he wasn't home to give them to him so that it was the plaintiff that gave it to him. He physically could not have been the only one giving that because he wasn't home during the day. At a minimum, he was gone six hours a day and at times 12. And at times six days in a row. Both parties certainly relied on their parents for providing childcare for the children. But at no time did plaintiff rely on her parents for daycare to interfere with her ability to parent for children. She still was the one putting them to bed. She still was the one bathing them. She still was the one preparing meals for them. During a temporary period when she lived with her parents, the testimony was she did everything related to the kids. She was the one driving them to school. She was the one getting them dressed. On the contrary, when the defendant relied on his parents, there was testimony that his mom was the one giving baths, that his mom was preparing meals. And he also wasn't living with them but would bring them over there for one night a week to spend the night for assistance. Plaintiff, and it was not disputed at any time, that she was not the primary caretaker. She routinely took the children to church. She took the children to family functions. Most of these on Sundays when the defendant would remain at home. Whether it was that he didn't like her family or didn't like her at the time, he chose to stay at home and allowed her to go away routinely on Sundays with the children. And a lot of times that was his only one day off. The trial court did find that the plaintiff had the ability to parent the children, that she loved her children, and that she was not an unfit parent. And I think in this case specifically, you're dealing with two parents that are good parents. They may not make the choices that you or I would make as a parent. They may do things a little bit differently. We're dealing with two perfectly good parents, each with their own little faults. Each aren't perfect, but they're doing the best they can. At some point, the court should have balanced the stability and the continuity and given more consideration to the fact that she was the one who had done everything. It's as if he had two good parents and let me try out to see if maybe Mr. Feiler, the defendant, is a better parent. And I don't think there was any reason to do that. I think it was a mistake to change custody from a good custodian to another one, hoping, well, maybe he'll be just a little bit better. There was an awful lot of emphasis put on the fact that plaintiff did choose to socialize after the kids went to bed. There was a specific testimony for going to a bachelorette party, but she waited to go until the children were put to bed. And I think it was in error for the judge to put so much emphasis on alleged misconduct or actions of the defendant, or plaintiff, excuse me, that had absolutely no bearing on the children. And I understand the importance of taking it into consideration, especially if it's interfering with the stability of the children's lives. There was, and I kept reading the record thinking I was going to find something that said because she was doing this, the children cried all day. The children cried in the morning. The children were wetting the bed out of the blue. That there was going to be something specific showing that by her actions of going out after the children went to bed, that they were impacted in some way. And there wasn't. There was one statement from the defendant claiming that the daughter had told him, are you going to leave too? That was it. The children were well-rounded. They were happy. They were loved by both sets of grandparents and parents. And the one child that was at school age was doing great. The teacher said she was one of the top students in her class. And I don't think that any weight should have been placed on those actions when you look at the fact that it had no impact on the stability of the kids' lives. Would you connect that at all with tardiness? I mean, I don't know that, I wonder how many people in the room, many of whom have had children, have ever gotten a note from a teacher that says your child is going to be dropped from this program because you can't get him here. That's not typical. No, it's not typical at all. Could the judge have fairly drawn that inference that this socializing did have an effect? I think if it was routine and she was going out Monday through Friday, and Monday through Friday, or she went out every Wednesday night, so every Thursday night for 10 weeks the child was late to school. In this case, the defendant argued it was very routine, but if you look at the testimony of the specific instances that she went out, we're talking about six to eight times over a seven-year period. Now, the defendant testified that she went out 50 times like this, but there was no testimony to the 50 times. Well, it was his testimony. I'm sorry, there was no other testimony of actual sightings of her out and about. With regard to the tardiness issue, the only thing that addressed that was her testifying that she wasn't good at keeping time. There was no connection, I don't think, with a party on Wednesday night and what she had on Thursday. One of the most important considerations, I believe, in this case that was just missed or skimmed over was the stability of the children's environment. Did anyone corroborate your client's claim about the apparent suicide attempt? Just her, no. But she testified. She arrived there with her sister and found him. I don't know if he was unconscious or asleep, empty pill bottle and so forth. Her sister testified. I believe it was a different sister. Different sister? I believe so. And the father denied that that occurred. So who do you believe? I don't mean you, but I mean who does a fact finder? I think the fact finder has to look at all the evidence, which I truly... What if a fact finder concluded that that did not occur? Or if it had occurred, it would have been easy to corroborate with another witness, even though that witness might have favored your client, at least it would have been another pair of eyes. I mean, that's a pretty extraordinary event, as well as the event of calling and saying, you really need to come and pick up the children because I feel like I'm going to harm myself and I don't think the kids are going to be safe with me. One side says that happened and the other side says it didn't. I think the judge has a balance in this case. There were allegations of physical harm as well. There were allegations of her throwing things. And it appeared to me that the judge discredited both of those instances and set them aside. Those are her testimony regarding the mental stability of the defendant are within the first couple days of testimony, which just didn't seem to be part of the judge's decision. And I understand... I'm in front of Judge Little every day, and I don't necessarily think he went into this deciding, you know what, I'm not going to find in her favor, I don't like her. I truly believe you had two really good parents. He found for one parent the fact that he was the better parent, but for some reason overlooked all these other factors that supported Leanna the plaintiff being the parent of these children, the custodial parent. He seemed to focus on her going out at night and her putting the kids to bed or dropping them off at her mom's house. Or there was testimony in the record that on nights that the children were with dad, he had people following her around to figure out where she'd been. I don't see how that is irresponsible when the kids are with dad and she goes out for the evening. But still that was taken into consideration when the record is clear that there was no impact on the children. There wasn't a psychologist who came and testified to say, you know, this child has abandonment issues, she's afraid that mommy's going to be gone. No, the testimony was completely the opposite. These children had a loving, attached relationship with their mother. The testimony about dad was that half of it was that he was alone and his interaction was limited. The other half was that he was a good dad, that he had a great time with his children when he was home. But that was limited to when he was home. And I think if we weigh the evidence, all the evidence in favor of her and all the evidence in favor of him, the judge for whatever reason thought it was in favor to the defendant. But when you look at the record as a whole from the very first day of testimony through all six days, I do believe that is weighted towards our client. And I think the basic premise for that is that both parents are equal parents, both parents are not perfect, but they're doing a good job with their kids. You look at continuing that continuity and stability for those children. We're not dealing with children who are having severe behavioral issues that we're falling apart. Thank you, counsel. You'll have additional time on the ballot. Mr. Erickson. If it pleases the court, counsel, I'm Fred Erickson. I'm a lawyer from Decatur, and I'm representing Donald Beiler. The argument that we've just heard would have been maybe a good argument at the end of the trial to try to persuade the fact finder of certain things so that he would award custody to the mother. The fact is that the posture in this case now, as some of your honors have pointed out, is one of determining whether there was an abuse of discretion by the trial court. Abuse of discretion has been defined many ways. The standards for determining it have been recited by various appellate courts. My favorite, because I think it's more clear, I've never understood what manifest way to the evidence in that. It seemed to mean whatever the arguer thinks it should mean. Abuse of discretion occurs only where no reasonable person would take the view adopted by the trial court. It's from a recent decision by this court. To me, that's understandable. Did the trial judge go completely off the reservation? Did he do something that no reasonable person would do? And in trying to decide that, the rules are very clear. There's a strong presumption that favors the trial court's decision. A great weight is to be given to the trial judge's ability to observe the parties and their behavior and their personalities. None of that comes through in the record. This judge had these people in front of him for six days. We had 1,200 pages of transcript. It's impossible to condense that down into either a short argument or even a brief. He got to know something of these people, and that is something that can never be ignored by the appellate courts and normally isn't ignored by the appellate courts. The appellate counsel's final comment here about the surveillance done by your client? That's all untrue. None of these instances where we testified to her being gone after the separation from her children, none of them were when they were with him. I understand she can go out and do whatever she wants when it's not a night she's got to be with him. Your client didn't have people surveilling her client? Oh, yes, but not during nights when he had custody. Isn't that sort of discomforting? In a child custody case, you go out and hire a private investigator? Well, let me answer it this way. I think it's clear from a record in this case that this lady was only going to admit things that could be proved by irrefutable evidence, and the only way that you can establish certain facts is through observations by people. Now, this didn't happen over and over again, and she never testified she thought she was under surveillance or thought she was being followed or ever testified she thought she was being harassed. No, I don't find anything. Is this really a case where we're looking out for the best interest of the children, or is this a case where the two parties hate each other? This is a case where I think we should be looking out for the best interest of the children, and I think the trial judge did that. This is not a case where you get a reward for being a nice person or punished for being a bad person. It's over what's best for these kids, and this trial judge wrote a very conscientious, thorough opinion where he made multiple findings of fact that are the basis of his decision. I don't know that any... maybe they hate each other, I don't know, but that didn't seem to have anything to do with the judge's decision. I'm just sort of troubled by the fact that you had surveillance in a case like this. How else are we supposed to find out what the lady's doing? Why does it matter? What? Why does it matter what she's doing? Well, it matters... If it's a period that she doesn't have the children... If it's an occasion when the children are to be with her and she elects on those occasions to leave the children with her parents and be out until 2 in the morning and so forth, now when you try to decide which of these parents would be the best parent for the child, you've got one who wants to stay home with them and who's there with them, and the testimony was they do wake up in the night. She testified to that. If they wake up in the night, one parent is there, and one parent isn't there. But if you had a married couple that was happily married and did that, the people in their circle of friends and maybe even at their church would say, you're lucky to have grandparents who live nearby. You're lucky to have grandparents that live in the same town as opposed to living in North Carolina. Isn't it nice that you can have a date night in the middle of the week? But the effect would be the same. Neither parent would be there when the child woke up, but a grandparent would be there, and apparently the grandparents here, maybe on both sides, have quite a bit of contact with the kid. Well, I think it is reasonable for a trial judge in a situation like this where we have one parent who sneaks out after her husband and children are asleep, according to the testimony, 50 times in a period of a couple of years, comes home at 2, 3, on one occasion, 4 in the morning. If you're trying to decide which parent these kids are going to be better off with, I think that the one that is out as opposed to the one who isn't out, that would be one of the factors that a judge could properly consider. I'm not saying that if somebody goes out three times a week or she goes out with her girlfriends and has dinner or something like that, that somehow that would disqualify her. But if you've got somebody who repeatedly is out until very late at night, 2 in the morning, coming home drunk, police are, you know, there's some sort of an accident with a car, police are trying to find her, she says, I couldn't approach the car because I'd had way too much to drink. I mean, these are, I think, factors that bear on the personality of the person, the demeanor, the character of the person, that is a relevant issue. But there are other things other than that, of course. I mean, in the brief, in the argument, I mean, we don't hear anything about, this lady leaves the kids in a car, in a Cadillac Escalade that's running on a public street or in a public parking lot to do business. Now, how in the world can you be giving the proper amount of attention and consideration to your children and do that kind of stuff? That was one of the things the judge commented about. My client came upon her at one time when she was in a, the kids were sitting in this car in a parking lot of a convenience store, doors unlocked, engine running, she's inside doing her business. We had two witnesses that were independent witnesses who were not members of the family who observed this kind of behavior and were concerned enough for the children that they just kept watching, and one lady said if it went on for another minute or so, I was going to call the police. I was concerned about this. This incident where the child had a severe diaper rash, and that's the only way you can call it. I don't know whether the courts had access to these photographs or not. The testimony was that my client hadn't had the child for five days before this happened. The complaint by counsel is, well, he didn't call or take the child to a doctor. This was discovered about somewhere less than 30 minutes before custody had to be returned to the mother while a bath was being given at some time after normal business hours. So they got the child dressed. He took the child out to the mother and said you better take a look at this. She's got a pretty bad diaper rash. Maybe she ought to see a doctor. The mother didn't take her to a doctor. The judge found that was the case, but they're still arguing in their brief. Oh, she took her to a doctor the next day, and that cured it up. Even though the mother testified, she didn't even know about this rash until she saw a picture. But we're going to deal with this. We're going to take these facts and try to pound them into something that is not justified here. In terms of the grandparents, the parties stipulated that the relationship to the grandparents in the fact circumstances of this case was very important because each party said these are the people we're going to use to give care to the children when we're not available. And that really means that several hours every day that grandparents are going to be involved in giving care. The care that was given by her parents, the court found specifically to be of a concern in terms of the actual safety of the children. The evidence was that the judge found it to be a fact. They let the kids play in the street, in the front yard, unfenced front yard, half a block from a four-lane state highway without adult supervision. The court found that was the case. That's what's happening. The evidence was that at one point one of the children got away from the grandmother and had to dispute over how long she was gone. In terms of this late night outings and what effect this has, there was evidence that on two occasions while the parties were still together, the little girl then three years old was outside the house running around. The mother was asleep. The evidence was my client said it's hard for me to take care of the children when I've been out at night. One occasion he came home and the kids were locked in a bedroom while the mother's asleep. So when you start telling me that going out until two in the morning and doing a lot of drinking has no effect on your ability to care for the children the next day, I suggest there's plenty of evidence that that was the case here. Her mother may be a wonderful lady. I don't know her. But after we took the deposition of the mother, the grandmother, Leanna's mother, was so enraged that she took off on a car chase after my client and his parents where she for a distance of six, eight miles would rush up to the back of their car and get within all the Beiler family said within a few feet, scared them. They were afraid there was going to be an accident. We put the mother on the witness stand or they put the mother on the witness stand and I said, what happened? How close did you get? Well, I don't know. I was just upset. I wanted to talk to him, to Donald. You had to talk to him by chasing him down, by endangering the children? Well, I don't know how close I was. After that testimony we asked Leanna, are you still going to use your mother for this daycare? Did this testimony concern you? No, that didn't concern me at all. I don't think that it happened that way. I don't remember that she denied knowing how close she was to the Beiler car. Yeah, I'm going to continue to use my mother. Well, okay. We didn't force this on her. And their position is we're going to use this daycare provider even though she has endangered the children on occasion. It's not even serious enough for us to talk to her about it. Now, the judge put weight on that and weight on the fact that while the children were being cared for by her parents, that they were not closely supervised, I think is what the judge said. Now, this expulsion warning, I mean, who of us, my Lord, if we got a letter from the kids from the school saying we're going to put your kid out, you're going to be expelled if you're late again? And understand, this is a five-year-old kid. She can't control how she gets to school. This is completely on the mother. We went through with her parents and said, is Leanna the one that took her to school? Yes, except for one time the father was late, but the other times she wasn't late when we took her. So this is all on Leanna. After she gets this letter that she's tardy four more times. Any one of us who got a letter like that from the school, I would hope, there would never be a problem again. We had a witness who said after that letter was sent, he saw her pull up to the school after all the other kids had gone in, let the child out of the car and just walk up to the school by herself with the mother pulling off, even though it was very clear from the evidence of the teacher and everybody else, if you're late, if you're tardy, you walk the child into school. You don't just dump her and take off. There's other things that maybe aren't as dramatic. People are required in Decatur to go to a transparent class. They're taught it's not good for the children to be introduced to third parties that you're dating when you're separated until the kids have a chance to get used to it. The evidence was my client had a girlfriend, but he didn't do that. He didn't have his girlfriend around the children. Mrs. Beiler admitted she told her husband, I'm going to have the children around my boyfriend, Mr. Seldot. Got the kids asking, are we going to have a new daddy? Are these going to be our new sisters? I mean, introducing for whatever purposes she had, putting the kids in a situation where there's even more confusion and contrary to what they're told. Are we going to make them go to these classes? And then they deliberately violate what they're told. Those are factors, and the judge just took that into account as one of the things that he thought was important. On the other hand, my client, there's not a lot to be said about it. Good behavior doesn't generate a lot of comment. Her mother, who's her chief supporter, said she'd been around when Donald was caring for the children, she had no complaint, no criticism. Those were her words, I have no criticism. What I saw, her sister said when I saw Donnie with him, he was a loving, caring person. She went to work out at a gym, she worked at a gym two days a week and worked out at a gym two days a week. On the day she worked out, and her parents, by the way, live right within a half a block of this gym. When she went to work out, the testimony was, my client took care of them on those evenings for a couple hours after he'd worked while she went to her workout. She at one point went to Texas for three or four days, left three days I think it was, left the kids with him, there was absolutely no problem. We had witnesses who testified, they'd seen him care for the child and one of them said he's a great dad. They all had nothing but good to say about the care that he gave the child. They want to portray him as somebody who virtually had nothing to do with these children. Do you agree that she was the primary custodian? I think within the broad definition of that, yes. But one of the things we know we're not going to have is any stay-at-home parent after this divorce. Both of them are going to be working, both of them are in school, there isn't going to be any beaver-cleaver's mother situation. That would be optimal if everybody stayed together and we could have the old-time nuclear family and so forth. But she's not going to be home with these kids ever again, no matter what we do here. And he's going to be working too. That was the testimony. That was what the judge was presented with. So what the judge had to decide was going forward, given all the problems he'd heard about her and her family and nothing but favorable about Donald, what's the best thing for these kids going forward? And what's the basis of second-guessing that? Saying, well, I can tell, I mean, I certainly wouldn't claim, and I assume very few people would, say, I can tell by reading a record which parent would be best. You know, when I say a jury is the greatest lie-detector test out there, well, a judge who's been listening to witnesses for 15 or 18 years ought to be pretty good at evaluating witnesses also, and certainly that's the case here. And I think this judge, to suggest that he forgot what happened early in the trial is ludicrous. I mean, this man sits there like he's his own court reporter. It's ridiculous to say that he forgot what she said early in the case and only decided it based upon the negative things that came out later. If you read their brief, and only their brief and their statement of facts, they absolutely ignored everything that favored the defendant. They absolutely ignored everything that was the basis of the findings by the trial judge. Now, this isn't a brief writing contest, but I think it is necessary. I'm sure the court has not limited itself to what they've written in their statement of facts. It's simply not accurate. It's not consistent with the rule requiring a fair statement so that the court can understand what happened in the trial court. If everything is considered, at the very least, there is no basis for finding an abuse of discretion in this case. My client can't be two places at once while he's working and taking care of his kids. No criticism of him. For a year, he had the kids two nights a week and every other weekend during the separation. Never a problem. Ever. No complaint by anybody. In fact, Mrs. Byler said... Thank you, Mr. Erickson. Oh, okay. Thank you very much. If you have any more questions, I'll be happy to... Thank you. Rebuttal? Thank you. I'd like to touch upon one thing real briefly regarding the surveillance. This wasn't just some innocent thing that happened once or twice. The first time that the plaintiff was made aware of the surveillance was at her deposition. And the grandmother's testimony was that after the deposition, she drove over to speak to Mr. Byler, telling him to let's just cool things off. And that's also the testimony regarding some high-speed car chase. Her testimony was that she didn't remember how fast she was going. She didn't remember lunging at the vehicle. She waited there when she noticed that his parents were there. She figured out it wasn't a good time to talk. The surveillance wasn't just based on him surveillancing her. There were, in the record you will find, there were multiple occasions where he called to say something's up with her. Could you please follow her? To a professional private investigator, to his father, and to his brother-in-law. So this wasn't just one or two little instances. It was something ongoing throughout this trial. But the defendant was at home with these children in the evenings because he was gone during the day. And at the point in which Ms. Byler started socializing after the children went to bed, their marriage was over. This was right before a second time that they had separated. They already had previously separated. If Mr. Erickson's argument is one parent's out, so one parent's at home, therefore that parent should have custody, he was out all during the day. He wasn't home with the children. It was her. So if that's the argument, here we have moms at home all during the day with the children, dads at home in the evening, again we're probably at a little bit of an even standpoint of, okay, now what's the determination? The testimony was refuted by other witnesses regarding seeing the children parked in front of the house unattended, seeing the children parked at the bank unattended. There was testimony by people familiar with that area, familiar with how far away they were that would have been nearly impossible. His testimony, or Mr. Erickson's statements regarding the record and testimony that she dropped the kid off without knowing that the teacher was there. There was testimony right after that witness saying from where he was sitting in a subway parking lot and looking across the street, one, it was a huge distance. Two, it was impossible to see in the front door to see whether or not there was a teacher. These are just little things, but when you look at the whole record supporting those or disputing those, it's a little bit different than just a clear-cut picture. I strongly believe the amount of weight that was placed on the grandparents was not fair in this case. There was a stipulation between the parties to take into consideration the relationship that the children had with the grandparents, to take into consideration the time that those grandparents would be with the children. It wasn't like my parents who live in California and see my kids every two months. This was that the parents and grandparents would be with them every day. The stipulation was in no way as an exchange for her ability to parent the children, to make good judgment calls with the children, or to allow the judge to decide, okay, the Bylers are better grandparents, therefore he gets custody because they're the better grandparents. That wasn't taken into consideration, nor should it have been. There were good facts and bad facts introduced at trial about both parents. There's no dispute on that. I could sit and list all the good facts, Mr. Erickson could list all the bad facts, and where are we? We're probably at a position where both parents were equal. He wasn't perfect, she wasn't perfect. When it comes down to that, the thing that should have been taken into consideration to break that was who was the primary caretaker of the children, and who provided the most stability and continuity in their life. And that should have been continued. It wasn't a trial basis, let's just go see if dad's a little bit better. And I've never heard an argument that violating transparency in class is a reason for someone to have custody of a child or lose custody. The child running away, that was testimony that grandma lost sight of her when she turned into the park. I have a two and three year old. I don't care how young you are, how in shape you are, every once in a while they're going to run in front of you a little bit. Again, not something of a lapse of judgment by client, or a lapse of judgment in her parenting ability, or that that's a bad grandparent. And I don't think it could be shocking today that his parents testified in favor of him, his sister testified in favor of him, and guess what? Her sister testified in favor of her, and her parents testified in favor of her. This all comes down to the trial judge and weighing the evidence in this case and what the decision should have been. In appealing custody orders, it's clear you can use abusive discretion or that it was against the manifest weighted evidence. It's our position today that the evidence shows, the record would show, that the trial court's decision was contrary to the weight of the manifest weighted evidence. And that's why we're asking today to reverse the trial court's decision. Thank you. Thank you. We'll take this matter under advisement and stand in recess until the readiness of the next matter.